IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

KAZANJIAN CONSULTING LLC,                     Case No.: 2023-021313-CA-01
a Florida limited liability company           Division: Civil

      Plaintiff,

vs.

EXAFER LTD., an Israel limited company;
AMIR HAREL; and
CHANDRAN B. IYER;

      Defendants.

_____/

## SUMMONS
## PERSONAL SERVICE ON AN INDIVIDUAL

TO:   **CHANDRAN IYER**
       8618 WESTWOOD CENTER DRIVE
       SUITE 150
       VIENNA, VA 22182

### IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached petition with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements.   You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the Plaintiff/Plaintiff's Attorney named below.

**WARNING:** Rule 12.285, Florida Family Law Rules of Procedure, requires certain automatic disclosure of documents and information. Failure to comply can result in sanctions, including dismissal or striking of pleadings.

### IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar

su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como Plaintiff/Plaintiff's Attorney (Demandante o Abogado del Demandante).

**ADVERTENCIA:** Regla 12.285, Florida familiares Reglamento de la Ley de Procedimiento, requiere cierta divulgación automática de documentos e información. El incumplimiento puede dar lugar a sanciones, incluido el despido o sorprendente de solicitudes.

## **IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du número de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au Plaintiff/Plaintiff's Attorney (Plaignant ou a son avocat) nomme ci-dessous.

AVERTISSEMENT: Règle 12,285, Floride droit de la famille règlement, nécessite certaine divulgation automatique des documents et informations. Le non-respect peut entraîner des sanctions, y compris le licenciement ou de radiation des actes de procédure.

If you choose to file a written response yourself, at the same time you file your written response to the Court located at **Clerk of the Court, Domestic Relations/Family Division, 175 N.W. 1st Avenue, Suite 1200. Miami, FL 33128.**

You must also mail or take a carbon copy or photocopy of your written response to the "Attorney" named below **Martin L. Hoffman, Esq. Hoffman, Larin & Agnetti, P.A., 909 North Miami Beach Blvd., Suite 201, Miami, FL 33162-3712 Phone (305) 653-5555.**

THE STATE OF FLORIDA TO EACH SHERIFF OF THE STATE:  You are commanded to serve this summons and a copy of the Petition in this lawsuit on the above-named Respondent.

Dated on _____8/17/2023_____, 20_____.

Juan Fernandez-Barquin,
Clerk of the Court and Comptroller

as Clerk of said Court

By: _____307965

as Deputy Clerk
(Court Seal)

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

KAZANJIAN CONSULTING LLC,                    Case No.:
a Florida limited liability company          Division: Civil

      Plaintiff,

vs.

EXAFER LTD., an Israel limited company;
AMIR HAREL; and
CHANDRAN B. IYER;

      Defendants.
_____/

## COMPLAINT FOR ANTICIPATORY BREACH OF CONTRACT, ANTICIPATORY BREACH OF THIRD-PARTY BENEFICIARY CONTRACT, UNJUST ENRICHMENT, INJUNCTIVE RELIEF, AND DECLARATORY JUDGMENT

The Plaintiff, Kazanjian Consulting LLC., ("Plaintiff") by and through undersigned

counsel, hereby sues Defendants, Exafer Ltd., ("Exafer"), Amir Harel ("Amir"), and Chandran

B. Iyer ("Chandran") and states as follows:

### THE PARTIES, JURISDICTION AND VENUE

1.  The amount at issue exceeds $50,000.00, exclusive of interest and court costs.

2.  Plaintiff is a Florida limited liability company with its principal place of business

in Miami-Dade County, Florida.

3.  Exafer is a limited company registered in Israel.

4.  Amir is an individual residing in Israel, who is *sui juris*.

5.  Chandran is an individual residing in Virginia, who is *sui juris*.

6.  This Court has jurisdiction pursuant to Fla. Stat §685.012, and §48.193; because

the cause of action arose in Miami-Dade County; because Defendants breached contracts in the

State of Florida with acts to be performed in Miami-Dade County, the location of Plaintiff's

principal place of business; the contract requires Florida law to apply; and because Defendants have sufficient minimum contacts with the State of Florida to satisfy due process requirements.

7.      Venue is proper in Miami-Dade County because the Defendants are non-residents under the jurisdiction of this Court and Plaintiff has elected to file suit in Miami-Dade County which is where its principal place of business is located, and where the cause of action arose.

## GENERAL ALLEGATIONS

8.      Plaintiff is a Florida limited liability company that offers strategic consulting services for inventors and patent holders who seek to monetize their intellectual property and patents.

9.      Plaintiff's principal place of business has been in Miami-Dade County at all material times.

10.     Exafer is an Israeli limited company that provides service control technology to telecommunications operators; Amir is the co-founder, and owner of Exafer.

11.     On or about May 24, 2018, following extensive negotiations conducted by phone and email, Plaintiff and Exafer, represented by Amir, entered into an exclusive, worldwide, broker agreement (the "Broker Agreement"), regarding the monetization of U.S. Patent Nos.: US 8,971,335 and US 8,325,733 (the "Patents"), whereby Exafer agreed to pay Plaintiff a commission of 30% of the net recovery resulting from Kazanjian's efforts in monetizing the Patents. The Broker Agreement is attached hereto as **Exhibit A.**

12.     The Broker Agreement provides in pertinent part that:

s. 4.1: *"Client agrees to pay Kazanjian a Commission of 30% of any net monies . . . obtained by or due to Client (or any Affiliate of Client) from a Transaction. . ."*

s. 5.1: *"In the event that Client enters into a contract with a third party, introduced by Kazanjian, for services to enforce its Patents,*

> *then Client agrees to have the Commission due to Kazanjian paid*
> *directly by such third party collecting the licensing revenues."*

13.     On or about September 12, 2018, Plaintiff introduced Exafer and Amir to Chandran, who was then the Chair of the Intellectual Property Law Practice at the law firm of Goldberg Segalla LLP.

14.     Plaintiff was instrumental in Chandran and Goldberg Segalla LLP being retained to represent Exafer in connection with the Patents and was also involved in extensive negotiations, conducted by phone and email, regarding the terms of the retainer agreement dated April 4, 2019, between Chandran, Goldberg Segalla, and Exafer (the "Retainer Agreement"). The Retainer Agreement is attached hereto as **Exhibit B**.

15.     Consistent with clause 5.1 of the Broker Agreement, the first paragraph of page 4 of the Retainer Agreement (titled Settlement, Judgment or other Compensation), provides that:

> *"Counsel shall be the recipient of all payments made under any . . .*
> *Judgment or Settlement, which shall promptly be deposited in*
> *Counsel's trust account. After deductions . . . Counsel shall then*
> *disburse the remainder to Client and to Connie Kazanjian within 15*
> *days of receipt thereof by Counsel, and in the case of Connie*
> *Kazanjian, pursuant to her separate written agreement with Client.*
> *. . In the event of any fee dispute, all monies shall remain in escrow.*
> *. ."*

16.     After the execution of the Retainer Agreement, Chandran left the law firm of Goldberg Segalla and started his own firm called Daignault Iyer LLP, taking Exafer with him as a client.

17.     Throughout the year of 2021, Chandran assured Plaintiff that the terms of the Retainer Agreement would continue to govern the relationship between Chandran, Exafer, and Plaintiff, and that Plaintiff's commission per the Broker Agreement would be protected by Chandran and his firm.

18.     As a result of the Broker Agreement, the Retainer Agreement, and based on representations made by Exafer, Amir and Chandran to the effect that Plaintiff would receive the 30% commission identified in the Broker Agreement and that her Commission would be protected by the Broker Agreement and the Retainer Agreement, Plaintiff provided consulting services, information, and litigation support to Exafer, Amir, and Chandran from the date of the Broker Agreement and has continued to perform under the terms of the agreement..

19.     Plaintiff's consulting services, information, and litigation support to Exafer and Amir resulted in a lawsuit by Exafer against Microsoft in *Exafer Ltd v. Microsoft Corporation* (1:20-cv-00131), District Court, W.D. Texas, filed on December 4, 2019 (the "Microsoft Litigation"), in which Plaintiff played a pivotal role, and in which there is now a distinct possibility of a multimillion-dollar recovery by Exafer, which would translate to a significant Commission for Plaintiff.

20.     On or about August 27, 2021, Amir and Exafer, without justification or good cause, unequivocally informed Plaintiff that he will not pay Plaintiff the Commission agreed to in the Broker Agreement if Exafer succeeds in the Microsoft Litigation.

21.     Plaintiff demanded assurances that Amir and Exafer would comply with the obligation to pay Plaintiff's Commission pursuant to the Broker Agreement and Amir and Exafer failed to provide adequate assurances, instead, they confirmed that Plaintiff will not receive the agreed upon Commission.

22.     On or about July 18, 2023, Plaintiff sent letters to Goldberg Segalla LLP, Chandran's former firm, and to Chandran, notifying them of the Broker Agreement Commission dispute between Kazanjian, Amir, and Exafer, and reminding Goldberg Segalla of its obligations under the Retainer Agreement to protect Kazanjian's interest in the net proceeds of the Microsoft

Litigation. The letters sent to Goldberg Segalla LLP and Chandran are attached hereto as **Exhibit C** and **Exhibit D** respectively.

23.    Goldberg Segalla LLP indicated that it no longer represents Exafer.

24.    Chandran has not responded to Plaintiff.

25.    Plaintiff has complied with the terms of the Broker Agreement at all material times.

## COUNT I
### Anticipatory Breach of Contract

26.    Plaintiff hereby repeats, reiterates, realleges and incorporates by reference allegations 1 through 25.

27.    The Broker Agreement entitles Plaintiff, in return for her efforts to monetize the Patents, to receive the Commission based on any monies recovered by Exafer and Amir in the Microsoft Litigation.

28.    Plaintiff has complied with and continues to be in compliance with all of the terms and conditions set forth in the Broker Agreement.

29.    On or about August 27, 2021, Amir and Exafer unequivocally informed Plaintiff that Exafer will not pay Plaintiff the Commission agreed to in the Broker Agreement if Exafer succeeds in the Microsoft Litigation.

30.    Plaintiff demanded assurances that Amir and Exafer would comply with the obligation to pay Plaintiff's Commission pursuant to the Broker Agreement and Amir and Exafer failed to provide adequate assurances, instead, they confirmed that Plaintiff will not receive the agreed upon Commission.

31.    The Broker Agreement does not provide Amir or Exafer with any authority to unilaterally refuse to pay Plaintiff's Commission when it becomes due.

32.    Plaintiff has complied with the terms of the Broker Agreement at all material times.

33.    Amir and Exafer have anticipatorily repudiated the Broker Agreement by expressing an unequivocal intention not to pay Plaintiff's Commission when it becomes due without justification or good cause.

34.    Amir and Exafer have never placed the Plaintiff on notice of any breach of the terms of the agreement.

**WHEREFORE** Plaintiff hereby requests that this Court find that Defendant has anticipatorily breached the Broker Agreement with respect to the Plaintiff and the Plaintiff's Commission under the Broker Agreement and award any other relief this Court deems proper.

## COUNT II
### Anticipatory Breach of Third-Party Beneficiary Contract

35.    Plaintiff hereby repeats, reiterates, realleges and incorporates by reference allegations 1 through 34.

36.    The Retainer Agreement between Amir, Exafer, and Chandran specifically manifests an intent to benefit Plaintiff.

37.    Consistent with clause 5.1 of the Broker Agreement, the first paragraph of page 4 of the Retainer Agreement (titled Settlement, Judgment or other Compensation), provides that:

> *"Counsel shall be the recipient of all payments made under any . . . Judgment or Settlement, which shall promptly be deposited in Counsel's trust account. After deductions . . . Counsel shall then disburse the remainder to Client and to Connie Kazanjian within 15 days of receipt thereof by Counsel, and in the case of Connie Kazanjian, pursuant to her separate written agreement with Client. . . In the event of any fee dispute, all monies shall remain in escrow . . ."*

38.    Plaintiff is therefore an intended third-party beneficiary to the Retainer Agreement.

39.    On or about July 18, 2023, Plaintiff sent a letter to Chandran at his new firm, Daignault Iyer, notifying them of the Broker Agreement Commission dispute between Plaintiff, Amir, and Exafer, and reminding Chandran of his obligations under the Retainer Agreement and

based on his and Amir's representations to Plaintiff, to protect Plaintiff's interest in the net proceeds of the Microsoft Litigation. The letter sent to Chandran is attached hereto as **Exhibit D.**

40.     Chandran has failed to respond to Plaintiff.

41.     Chandran, by his inaction and failure to respond to Plaintiff's demand for assurances, has demonstrated an intent not to comply with the terms of the Retainer Agreement, thereby violating Plaintiff's third-party beneficiary rights to proper handling of the Commission guaranteed by the Retainer Agreement.

42.     Chandran has anticipatorily repudiated the Retainer Agreement with respect to Plaintiff's third-party beneficiary rights by refusing to respond to Plaintiff's demand for assurances that he will comply with the terms of the Retainer Agreement.

43.     Plaintiff has suffered and will continue to suffer damages as a result of Chandran's anticipatory repudiation of the Retainer Agreement.

**WHEREFORE** Plaintiff hereby requests that this Court find that Chandran has anticipatorily breached the Retainer Agreement with respect to the Plaintiff's third party beneficiary rights under the Retainer Agreement, and award any other relief this Court deems proper.

## COUNT III
## Injunctive Relief

44.     Plaintiff hereby repeats, reiterates, realleges and incorporates by reference allegations 1 through 43.

45.     This is a claim for temporary and permanent injunctive relief pursuant to Fla. R. Civ. Pro. 1.610 and other applicable law.

46.     The actions of the Exafer and Amir, in anticipatorily repudiating the Broker Agreement; and the actions of Chandran, in anticipatorily repudiated the Retainer Agreement with

respect to Plaintiff's third-party beneficiary rights by failing to assure Plaintiff that her Commission will be safeguarded in accordance with the Retainer Agreement, constitute matters of grave public importance.

47.     Exafer and Amir have unequivocally anticipatorily repudiated the Broker Agreement by stating that Plaintiff will not be paid the Commission.

48.     Chandran, by his inaction and failure to respond to Plaintiff's letter attached as Exhibit D, has demonstrated an intent not to comply with the terms of the Retainer Agreement and thereby violate Plaintiff's third-party beneficiary rights to the Commission guaranteed by the Retainer Agreement.

49.     Chandran has anticipatorily repudiated the Retainer Agreement with respect to Plaintiff's third-party beneficiary rights to the proper handling of the Commission.

50.     If Exafer, Amir, and Chandran are not enjoined pending trial, there is credible risk of irreparable harm to Plaintiff's entitlement to the Commission from the Microsoft Litigation, with potential loss, jeopardization, or untraceable disbursement thereof, particularly considering the out of state domicile of Chandran, and the overseas domicile of Exafer and Amir.

51.     Plaintiff has complied with and continues to be in compliance with all of the terms and conditions set forth in the Broker Agreement.

52.     Plaintiff's diligent efforts pursuant to the Broker Agreement, and representations by Amir and Chandran have contributed to Exafer's imminent recovery in the Microsoft Litigation, and it would be manifestly inequitable for her Commission to be imperiled.

53.     Money damages cannot provide an adequate remedy because the potential harm to Plaintiff if the Commission is not paid, may be difficult to quantify in monetary terms

since the Commission's value is contingent on the successful outcome of the Microsoft Litigation and its loss or non-receipt could have cascading financial repercussions for Plaintiff that would be challenging to remedy solely through monetary damages.

54.     Further, since Amir and Exafer are domiciled overseas, enforcing any monetary damages awarded may become arduous and complicated; the international legal landscape could impede Plaintiff's ability to collect its Commission even if a favorable judgment is obtained.

55.     Additionally, the Commission represents more than financial compensation; it is the culmination of Plaintiff's dedicated efforts in monetizing the Patents and in contributing to the Microsoft litigation, the loss or non-payment of this Commission, which is inherently unique and non-replicable, would cause irreparable harm to Plaintiff's professional reputation, morale, and financial well-being, surpassing the boundaries of traditional monetary damages.

56.     Based on the foregoing, the loss of the Plaintiff's Commission would be immediate, irreparable, even before the normal time permitted for the defendants to be heard in opposition.

57.     Plaintiff has a likelihood of success on the merits because Exafer, Amir, and Chandran are acting without legal authority, and in clear violation of the terms of the Broker Agreement and the Retainer Agreement.

58.     There would be absolutely no harm to the Exafer, Amir, and Chandran because of injunctive relief as the Plaintiff's Commission, which none of them are entitled to, would be held in trust pending the resolution of this matter; none of the defendant would lose anything, monetary or otherwise, as a result of an injunction pending conclusion of the litigation.

59.     Plaintiff has a clear right to relief under the terms of the Broker Agreement and Representation Agreement, and based on representations made by Exafer, Amir, and Chandran. Agreements and past practices of and between the parties.

60.     The public interest would be furthered by granting injunctive relief because such relief would uphold the integrity of the contracts and reinforce the positive public notion that agreements made in commercial settings are binding and enforceable, resulting in an adherence to contractual obligations, and discouraging breach of contract, which is crucial for maintaining a functioning and predictable business environment.

61.     Additionally, considering the foreign domicile of Exafer and Amir, granting injunctive relief would promote healthy international cross-border business relationships by requiring respect for contractual obligations and ensuring that parties fulfill their commitments regardless of location.

**WHEREFORE** Plaintiff hereby requests that this Court enter an immediate injunction preventing the Exafer, Amir, and Chandran, from disbursing any monies received from the Microsoft Litigation, until the Court hears the case on its merits after full discovery and appropriate motion practice. Plaintiff also requests the Court grant reasonable attorney's fees to the Plaintiff for the necessity of bringing this action to defend its rights and prevent irreparable harm. Plaintiff also requests the Court grant other relief the Court deems proper.

## COUNT IV
### Unjust Enrichment

62.     Plaintiff hereby repeats, reiterates, realleges and incorporates by reference allegations 1 through 61.

63.     Plaintiff alleges that in the alternative to its anticipatory breach of contract claim, Plaintiff is entitled to recover under the doctrine of unjust enrichment pursuant to common law.

64.    From May 24, 2018, to the present, Plaintiff has conferred a benefit on Exafer and Amir by assisting with monetizing the Patents and provided consulting services, information, and litigation support to Exafer generally and specifically with respect to the Microsoft Litigation.

65.    Exafer and Amir have knowledge of the benefit conferred on them by Plaintiff as they were in constant email and phone communication in connection with the Broker Agreement and Microsoft Litigation from the date of the Broker Agreement to present.

66.    Exafer and Amir have accepted and retained the benefit conferred on them by Plaintiff by utilizing counsel proposed by Plaintiff; commencing and progressing with the Microsoft Litigation; and utilizing Plaintiff's consulting services, information, and litigation support.

67.    The Microsoft Litigation would not have commenced without Plaintiff's consulting services, information, and litigation support to Exafer and Amir

68.    Exafer and Amir stand to recover a multimillion-dollar settlement or award of damages from the Microsoft Litigation as a result of the benefits directly conferred on them by Plaintiff.

69.    In the circumstances, it would be inequitable for Exafer and Amir to retain the benefit conferred on them by Plaintiff without paying the value thereof to the Plaintiff.

**WHEREFORE** Plaintiff demands judgment against Exafer and Amir in an amount to be determined at trial and all other relief that the Court deems just and proper.


### COUNT V
### Declaratory Relief

70.    Plaintiff hereby repeats, reiterates, realleges and incorporates by reference allegations 1 through 69.

71.     Plaintiff is entitled to and requests a declaratory judgment affirming the validity and enforceability of the contractual obligations contained in the Broker Agreement, including Plaintiff's right to receive the Commission.

72.     Plaintiff is entitled to and requests a declaratory judgment affirming that Exafer and Amir have anticipatorily repudiated the Broker Agreement.

73.     Plaintiff further requests a declaratory judgment affirming that Plaintiff is an intended third-party beneficiary to the Retainer Agreement, which is valid and enforceable.

74.     Plaintiff further requests a declaratory judgment affirming that Chandran has anticipatorily repudiated the Retainer Agreement with respect to Plaintiff's third party beneficiary rights to proper handling of the Commission.

75.     Plaintiff further requests a declaratory judgment that Plaintiff is entitled to receive a commission of 30% of the net proceeds of the Microsoft Litigation, pursuant to the Broker Agreement, the Retainer Agreement, and representations made by Exfer, Amir and Chandran.

76.     Alternatively, Plaintiff is entitled to and requests a declaratory judgment that Exafer and Amir's retention of benefits conferred directly on them by Plaintiff constitutes unjust enrichment.

**WHEREFORE** Plaintiff hereby requests that this Court find that the Plaintiff is entitled to a declaration that the Broker Agreement is valid and enforceable and Plaintiff is entitled to the Commission therein; that Exafer and Amir anticipatorily repudiated the Broker Agreement; that Plaintiff is a valid intended third party beneficiary to the Retainer Agreement which is valid and enforceable; that Chandran anticipatorily repudiated the Retainer Agreement with respect to Plaintiff's third party beneficiary rights; alternatively, that Exafer and Amir have been unjustly enriched; and that the Court order any other relief this Court deems proper.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was e-filed

and e-served via the Florida Court's E-Filing Portal on all counsel and interested parties of record

on this 14th day of August, 2023 and will be served via service of process on the defendants.

**HOFFMAN, LARIN & AGNETTI, P.A.**
909 North Miami Beach Blvd., Ste. 201
Miami, FL 33162
Telephone:     (305) 653-5555
Facsimile:     (305) 940-0090
E-Service:     pleadings@hlalaw.com

By: /s/ *John B. Agnetti*
**John B. Agnetti, Esq.**
Florida Bar No.: 359841

# Broker Agreement

This Agreement is made between the Parties for the purposes of facilitating intellectual property transactions.

This IP Broker Agreement ("**Agreement**") is entered into effective as of May 16th 2018 (the "**Effective Date**") between:

Kazanjian Consulting LLC, a Florida limited company with offices at 12555 Biscayne Boulevard, Miami, FL 33138 ("Kazanjian"); and

Exafer Ltd, a limited company registered in Israel VAT# 514272525, with an address POB 345 Ein Vered, Israel 40696 ("**Client**").

The parties hereby agree therefore that this Agreement shall be effective as of the Effective Date and shall (subject to termination hereunder) continue in full force until December 31st 2018.

NOW THEREFORE it is hereby agreed as follows:

1.      DEFINITIONS

1.1      **"Affiliate"** means, in relation to any entity, any company or other entity which directly or indirectly controls, is controlled by or is under common control with that entity, where "control" means the ownership of more than 50% of the issued share capital or other equity interest or the legal power to direct or cause the direction of the general management and policies of such entity;

1.2      "**Patents**" means:
(a) the provisional patent applications, patent applications, and patents listed on Exhibits A ("Listed Patents"), including patents or patent applications:
  (i) to which any of the Listed Patents directly or indirectly claims priority,
  (ii) for which any of the Listed Patents directly or indirectly forms a basis for priority or which otherwise share common priority with any of the Listed Patents, and/or
  (iii) that were co-owned applications that incorporate by reference, or are incorporated by reference into, the Listed Patents;

(b) reissues, re-examinations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing category (a);

(c) foreign patents, patent applications and counterparts relating to any item in any of the foregoing categories (a) to (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances; and

(d) any items in any of the foregoing categories (a) to (c) whether or not expressly listed in Listed Patents and whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like.

1

EXHIBIT
**"A"**

1.3    **"Transaction"** means a legally binding agreement between the Client (or, as applicable, Owner) and a Qualified Purchaser for a license, assignment or any other transfer of or access to rights in or relating to the Patents or any of them (including, if applicable, the sale of the relevant part of the Client's (or, as applicable, Owner's) business).

## 2. APPOINTMENT

2.1    Whereas, Client owns or represents the legal owner ("Owner") of the Patents and Client (or, as applicable, Owner) wishes to assign or license said Patents for valuable consideration;

2.2    Whereas, Kazanjian is in the business of representing patent owners in the marketing and promotion of patents and related intellectual property rights available for assignment or license;

2.3    Client hereby appoints Kazanjian, and Kazanjian hereby accepts such appointment throughout the Term of this Agreement, as Client's exclusive worldwide representative to facilitate and promote the sale, assignment and/or licensing of the Patents to any person, company, firm or other entity that may wish to purchase a license, assignment or other transfer of or access to all or any of the Patents (a "Potential Purchaser").

## 3  APPROACHES

3.1    Kazanjian may approach one or more Potential Purchasers at its sole discretion based on Kazanjian's market intelligence.

3.2    If and when Kazanjian provides to Client a Potential Purchaser who has expressed a definite interest in purchasing a license, assignment or other transfer of or access to all or any of the Patents (a "Qualified Purchaser"), Client will not directly approach such Qualified Purchaser in connection therewith unless Client can provide dated and documented evidence of a substantial prior relationship with such Qualified Purchaser relating specifically to the sale/purchase of a license, assignment or other transfer of or access to all or any of the Patents. After the completion of the 6-month term, Kazanjian shall provide a list of all Qualified Purchasers where explicit documented interest in in the assets has been given.  This list will define the Qualified Purchasers for the purposes of the Post Term arrangements.

3.3    Kazanjian will have no authority under this Agreement to bind Client in any way to any party or to make any representation, contract or commitment on behalf of Client.  In addition, nothing contained in this Agreement will require Client to accept the terms of any proposed sale.

## 4. COMMISSION

4.1    Client agrees to pay Kazanjian a (the "Commission") as thirty per cent (i.e. 30%) of any net monies, including the amount of any payment and the value of any non-monetary receipt obtained by or due to Client (or any Affiliate of the Client) from a Transaction including, but not limited to:

(a)   up-front, milestone, success, bonus, maintenance and periodic payments, royalty payments and any other payments or benefits for the term of Patents;

(b)   shares, options or other securities in respect of the share capital of any Potential Purchaser or any Affiliate of a potential purchaser, or any other company or entity;

(c)   any investment in the shares or other securities or in the business of the Client or any Affiliate of the Client;

(d)   the value and/or benefit of any debt assumption or debt forgiveness or cease of legal action (including but not limited to a patent infringement lawsuit); and

(e)   the value of any OEM agreements, distribution agreements, licenses (including cross licenses), or assets (including but not limited to other tangible and non-tangible assets as well as intellectual property assets);

(collectively the "Total Transaction Value").

4.2     This provision relating to the Commission will survive termination or expiry of this Agreement for any reason and will continue for the purposes of the clause 7.


5.      PAYMENT TERMS

5.1     Upon receipt by the Client of any payment or benefit comprising all or part of the Total Transaction Value, the Client will provide Kazanjian with a statement setting out the amount received and, in the case of any non-monetary receipts, stating the net monetary value attributed to that receipt and the basis on which this has been calculated.  In the event the Client enters into a contract with a third party, introduced by Kazanjian, for services to enforce its Patents, then Client agrees to have the net Commission due to Kazanjian paid directly by such third party collecting the licensing revenues.

5.2     Following receipt of any such statement, Kazanjian will issue an invoice for the Commission due to it. Notwithstanding the terms of the preceding two sentences, where Kazanjian receives notification from any third party or otherwise becomes aware that the Client has received any payment or benefit comprising all or part of the Total Transaction Value,

5.3     Kazanjian shall be free to issue its invoice immediately in respect of the Commission due to it thereon, regardless of whether or not the Client provides a statement, as described above.

5.4     All payments due from the Client to Kazanjian under this Agreement (i) will be paid immediately by return on receipt of Kazanjian's invoice; (ii) are exclusive of any value added or other sales, use, excise or similar taxes which may be due, all of which will be paid in addition by the Client at the applicable rate; and (iii) will be paid without deduction of income tax or other taxes, charges or duties that may be imposed, except in so far as the Client is required to make those deductions to comply with applicable laws.

5.5     The Client will keep separate accounts and records in sufficient detail to support the statements provided pursuant to this Agreement, and will permit Kazanjian or its duly appointed representatives during business hours and on reasonable notice (but no more than once in any period of 12 consecutive months) to inspect all such accounts and records and to take copies thereof.  Kazanjian will bear the cost of any such inspection, unless that inspection reveals that the Client has underpaid Kazanjian by more than five per cent (5%), in which case the Client will immediately reimburse the cost of the inspection and  pay any shortfall (plus reasonable interest thereon).

5.6     The proceeding provisions relating to the "Payment Terms" will survive termination or expiry of this Agreement for any reason and will continue indefinitely.


6.      COOPERATION

6.1     The Client will promptly provide all reasonable assistance, information, support and co-operation as Kazanjian may require from time to time, including without limitation, true and accurate information on the patents identified in Exhibit A.


7.      POST TERM

7.1     If a Transaction with a Kazanjian introduced party  should be completed within 12 months after the expiry of the Term or earlier termination of this Agreement then Kazanjian will remain entitled to one hundred per cent (100%) of the Commission.


7.2 This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.


8       ANTI CIRCUMVENTION

8.1     The Client (including any of its employees, agents, affiliates, and/or representatives) shall not: (i) circumvent Kazanjian in an effort to eliminate Kazanjian as the sole contact with any Qualified Purchaser, or attempt directly or indirectly to contact or conduct business or negotiate with any Qualified Purchaser relating to the Patents throughout the Term; or (ii) do or omit to do anything or enter into any side or other agreement in relation to, or including, the Patents in respect of which the intention or result is to reduce the Commission that would otherwise be payable to Kazanjian under this Agreement.  Any breach of this paragraph shall place the Client in material breach of this Agreement and liable for damages in favor of Kazanjian.

8.2     This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

4

9.      TERMINATION

9.1     Either party will have the right to terminate this Agreement if (i) the other party commits any material breach or series of minor breaches of any of its obligations under this Agreement which (if capable of remedy) it fails to remedy within fifteen (15) days following receipt of written notice from the other party, or (ii) the other party becomes bankrupt or insolvent, or if an order is made or a resolution is passed for its winding up (other than voluntarily for the purpose of solvent amalgamation or reconstruction), or if an administrator, administrative receiver or receiver is appointed in respect of the whole or any part of its assets or business, or if it makes any composition with its creditors or takes or suffers any similar or analogous action in any jurisdiction in consequence of debt.

10      NOTICES

10.1    Any notice under this Agreement shall be in writing in the English language and may be served by sending the notice by post or e-mail transmission addressed to the party to be served at the address given above or at such other address as that party shall from time to time by notice in writing give to the other party for the purpose of service of notices here-under.

11      LIABILITY

11.1    Nothing in this Agreement will operate to limit or exclude the liability of either party for death or personal injury resulting from its negligence or for liability for fraud.

11.2    Subject to the preceding sentence, Kazanjian's total liability to the Client in connection with the performance or non-performance of this Agreement, whether in contract, or tort (including negligence) or arising in any other way, shall not exceed $5,000

11.3    This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

12      MISCELLANEOUS

12.1    If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

12.2    No change, modification, extension, or termination of this Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by the parties.

12.3    This Agreement represents the entire agreement between the parties regarding the subject matter hereof and shall supersede all previous communications, representations, understandings and agreements, whether oral or written, by or between the parties with respect to the subject matter hereof.

5

12.4     Neither Party may assign or transfer (in whole or in part) this Agreement without the prior written consent of the other Party, except that either Party may assign this Agreement to an affiliated company or any third party to whom its business is transferred.


13       JURISDICTION

13.1     This Agreement shall be governed by, and interpreted in accordance with the laws of Florida, without regard to the principles of conflict of laws thereof.

13.2     Any legal or equitable action arising out of or relating to this Agreement shall be instituted and maintained exclusively in the courts of England and Wales except that either party may apply for an interim or emergency injunction in any court of competent jurisdiction.


**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) shown below.

**Kazanjian Consulting LLC**                    **Exafer Ltd**


_____                    _____
Signature                                    Signature

**Connie Kazanjian**                            **Amir Harel**


**President**                                  **Co-owner**

_____5. 24. 18____                            ____5.23.18____
Date                                         Date

**Exhibit A**

| Patent Number | Title | Assignee/inventor Name |
|---|---|---|
| US8971335 | System and method for creating a transitive optimized flow path | Exafer Ltd |
| US8325733 | Method and system for layer 2 manipulator and forwarder | Exafer Ltd |

7

This **Non-disclosure Agreement** (this "**Agreement**") is entered into effective as of October 1ᵗ 2018 (the "**Effective Date**") between:

Kazanjian Consulting LLC, a Florida limited company with offices at 12555 Biscayne Boulevard, Miami, FL 33138 ("Kazanjian"); and

**Exafer Ltd, a limited company registered in Israel VAT# 514272525 with an address POB 345 Ein Vered, Israel 40696** ("Exafer")

The parties hereto wish to have access to certain proprietary and confidential information of the other and are willing to receive this information under the strict obligations described herein.   The parties wish to protect the confidential nature of information disclosed under this Agreement

**NOW THEREFORE** it is hereby agreed as follows:

1.     **DEFINITIONS**

1.1     **"Affiliates"** means any subsidiary or holding company of an entity, any subsidiary of any of its holding companies and any partnership, company or undertaking (whether incorporated or unincorporated) in which an entity has the majority of the voting rights or economic interest.

1.2     **"Business Purpose"** means assessment of commercial investment opportunities and strategies conceived by the Discloser and associated activities.

1.3     **"Confidential Information"** means all information of the Discloser or a third party, including without limitation, information relating to the research, development, business plans, marketing, operations, finances, personal data of any such entity, which is disclosed by The Discloser directly or indirectly to the Recipient hereunder whether in writing (physically or electronically), visually or orally and which is designated as proprietary or confidential or which, under the circumstances, should reasonably be considered confidential.

2.     **OWNERERSHIP OF CONFIDENTIAL INFORMATION**

2.1     All Confidential Information is, and shall remain, the property of the Discloser.  Nothing herein shall be construed as granting any rights by licence or otherwise in the Confidential Information except as expressly provided herein.

3.     **OBLIGATIONS OF CONFIDENTIALITY**

3.1     The Recipient may use the Confidential Information received hereunder solely for the Business Purpose.

3.2     For a period of three (3) years from the receipt of Confidential Information hereunder, the Recipient shall use the same degree of care and means that it uses to protect its own confidential information of a similar nature, but in any event not less than reasonable care and means, to prevent the unauthorized use or disclosure to third parties of such Confidential Information.

3.3     The Recipient shall disclose the Confidential Information only to its officers, employees, consultants, contractors with a "need to know" for the Business Purpose and who have entered into confidentiality agreements sufficient to prohibit further unauthorized use or disclosure of the

EXHIBIT
tabbies "B"

Confidential Information. The Recipient may not alter, decompile, disassemble, reverse engineer, or otherwise modify any Confidential Information received hereunder and the mingling of the Confidential Information with information of the Recipient shall not affect the confidential nature or Disclosership of the same as stated hereunder.

3.4     This Agreement shall impose no obligation of confidentiality upon the Recipient with respect to any portion of Confidential Information received hereunder, which: (a) is or becomes publicly known through no fault of the Recipient; (b) is or becomes known to the Recipient from a third party source other than The Discloser without duties of confidentiality attached and without breach of any agreement between The Discloser and such third party; (c) furnished to others by The Discloser without restriction on disclosure; or (d) was independently developed by the Recipient without the benefit of the Confidential Information.

3.5     Nothing in this Agreement shall prevent the Recipient from disclosing Confidential Information to the extent it is legally compelled to do so by any governmental investigative or judicial agency pursuant to proceedings over which such agency has jurisdiction; provided, however, that prior to any such disclosure, the Recipient shall (i) assert the confidential nature of the Confidential Information to the agency; (ii) immediately notify the Discloser in writing of the agency's order or request to disclose; and (iii) cooperate fully with the Discloser in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of the compelled disclosure and protecting its confidentiality.

3.6     The Recipient agrees that this Agreement applies equally to all Confidential Information concerning the Business Purpose shared by any member of the Discloser's Group *(insert company name where applicable)* to the Recipient prior to the Effective Date.

3.7     The Recipient agrees not to directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertaking with any third party identified or introduced by the Discloser; or seek to by-pass, compete, avoid or circumvent the Discloser in respect of any business opportunity that relates to the Business Purpose by utilising any Confidential Information or by otherwise exploiting or deriving benefit from the Confidential Information, or use, rely upon, any Confidential Information in order to by-pass or circumvent the Discloser in any transaction involving a third party introduced or identified by Discloser.

4.     **NON-EXCLUSIVITY**

4.1     Nothing in this Agreement shall prevent the Recipient from pursuing similar discussions with third parties provided that there is no breach of the obligations of confidence hereunder. The obligations of confidentiality under this Agreement shall not be construed to limit the Recipient's right to develop independently or acquire products or services without use of the other party's Confidential Information.

5.     **TERM AND TERMINATION**

5.1     The term of this Agreement shall be a period of two (2) years from the Effective Date unless otherwise terminated.

5.2     Either party may terminate this Agreement immediately upon written notice to the other in the event of any breach by that other party of this Agreement.

5.3     Upon the written request of either party or upon the expiration or termination of this Agreement for any reason the Recipient will promptly return all copies of The Discloser's Confidential Information in its possession, power, custody or control.

5.4     Clauses 1, 2, 3, 4, 5.3, 5.4, 6 and 7 shall survive the expiration or termination of this Agreement.

6.     **NO WARRANTY; DISCLAIMER**

6.1     THE DISCLOSER MAKES NO REPRESENTATION, WARRANTY OR UNDERTAKING (EXPRESS OR IMPLIED) WITH RESPECT TO, AND DOES NOT ACCEPT ANY RESPONSIBILITY FOR, (AND HEREBY DISCLAIMS LIABILITY FOR), THE ACCURACY OR COMPLETENESS OF ANY CONFIDENTIAL INFORMATION.  THE DISCLOSER IS NOT RESPONSIBLE FOR ANY LOSS OR DAMAGE, DIRECT OR INDIRECT, FINANCIAL OR OTHERWISE OCCASIONED BY RELIANCE ON THE CONFIDENTIAL INFORMATION. THE DISCLOSER IS UNDER NO OBLIGATION TO PROVIDE THE RECIPIENT WITH THE CONFIDENTIAL INFORMATION AND MAY AT ANY TIME AND IN ITS SOLE DISCRETION DISCONTINUE ITS DISTRIBUTION. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS".

7.     **GENERAL**

7.1     <u>Equitable Remedies</u>. The parties agree that there is no adequate remedy in damages for any breach of the obligations of confidence hereunder and upon any such breach or any threat thereof by the Recipient, The Discloser shall be entitled to appropriate equitable relief, including injunctive relief in addition to whatever other remedies it might be entitled, including damages.

7.2     <u>Severability</u>.  If any term, provision, covenant or condition of this Agreement is held invalid or unenforceable for any reason, the parties agree that such invalidity shall not affect the validity of the remaining provisions of this Agreement and further agree to substitute for such invalid or unenforceable provision a valid and enforceable provision of similar intent and economic effect.

7.3     <u>Publicity.</u> The Recipient, without The Discloser's prior written approval, shall not make any public announcement or any disclosure as to the existence of or matters set forth in this Agreement.

7.4     <u>Assignment.</u>  Neither party may assign its rights or obligations under this Agreement.

7.5     <u>Waiver</u>.  The failure of a party at any time to require performance by the other party of any provision hereof shall not affect in any way the full right to require such performance at any time thereafter. Nor shall the waiver by a party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.

7.6     <u>Governing Law.</u>  This Agreement shall be construed in accordance with, and all disputes hereunder shall be governed by, the laws of England and Wales and shall be subject to the exclusive jurisdiction of the English courts.

7.7     <u>Entire Agreement: Modification</u>. This Agreement is the complete, final and exclusive statement of the terms of the agreement between the parties and supersedes any and all other prior and contemporaneous negotiations and agreements, whether oral or written, between them relating to the subject matter hereof. This Agreement may not be varied, modified, altered, or amended except in writing signed by the parties.

7.8    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) shown below.

Kazanjian Consulting LLC

*Connie Kazanjian*
Signature

Connie Kazanjian
Printed

Manager
Title

October 4, 2018
Date

Exafer Ltd

Signature

Amir Harel
Printed

Co-CEO
Title

Oct - 1 - 2018
Date



# HOFFMAN, LARIN & AGNETTI, P.A.
## ATTORNEYS AT LAW

JOHN B. AGNETTI

MARTIN L. HOFFMAN
ALSO MEMBER NEW YORK BAR

DAVID L. PERKINS
ALSO MEMBER NEW YORK BAR

MICHAEL S. HOFFMAN
———
OF COUNSEL

HAROLD M. HOFFMAN
MEMBER NEW YORK AND
NEW JERSEY BAR ONLY

(305) 653-5555
(800) 803-5555
FAX (305) 940-0090

INFO@HLALAW.COM
WWW.HLALAW.COM

909 N. MIAMI BEACH BLVD.
SUITE 201
MIAMI, FL 33162-3712

6750 NORTH ANDREWS AVE.
SUITE 200
FORT LAUDERDALE, FL 33309

82681 OVERSEAS HIGHWAY
ISLAMORADA, FL 33036

422 FLEMING STREET
KEY WEST, FL 33040

**VIA U.S. CERTIFIED MAIL**
**VIA EMAIL** msiem@goldbergsegalla.com

July 18, 2023

Mr. Michael A. Siem
Partner
GOLDBERG SEGALLA LLP
711 3rd Avenue, Suite 1900
New York, NY 10017

Re:   **URGENT: Client's Contractual Rights & Demand for Immediate Action**
      **Kazanjian Consulting LLC and Exafer Ltd Broker Agreement dd. March 16, 2018**
      **U.S. Patent Nos.: US 8,971,335 and US 8,325,733**

Dear Mr. Siem:

Please be advised that our firm has been retained to represent the interests of Connie Kazanjian and Kazanjian Consulting LLC (collectively referred to herein as "Client") in connection with the attached Broker Agreement between our Client, Exafer Ltd ("Exafer") and Exafer's principal, Mr. Amir Hare, with regards to the monetization of certain patents that are currently the subject of ongoing litigation with Microsoft[1]. Your law firm was engaged to represent Exafer in this transaction.

Further, my Client was instrumental in your firm being retained to represent Exafer. My Client not only secured the services of your firm, but also negotiated the terms of the retainer agreement with you and your firm.

Kazanjian Consulting LLC also provided information, and litigation support in the ongoing Microsoft Litigation.

According to the terms of the Broker Agreement, Exafer and Mr. Hare, expressly and unequivocally committed to paying our Client a commission of 30% of the net recovery resulting from

---

[1] Exafer Ltd v. Microsoft Corporation (1:20-cv-00131), District Court, W.D. Texas

Page **1** of **2**



EXHIBIT
"C"

our Client's efforts in monetizing said patents. However, now that there is a distinct possibility of a multimillion-dollar recovery, Exafer, through Mr. Hare, has indicated its unwillingness to fulfill its obligation to remit the agreed-upon commission. This sudden change in position by Exafer constitutes a clear violation of their contractual obligations and amounts to anticipatory repudiation of the Broker Agreement.

The enclosed Retainer Agreement, executed on April 4, 2019, between your firm, Mr. Amir Hare, Mr. Alon Lelcuk, and Exafer, expressly stipulates the following:

> "Counsel shall be the recipient of all payment made under any License Agreement, Judgment or Settlement, which shall promptly be deposited in Counsel's trust account. After deductions first for Compensation and second for Expenses Due Counsel, which Counsel shall be entitled to keep, **Counsel shall then disburse the remainder to Client and to Connie Kazanjian within 15 days of receipt thereof by Counsel, and in the case of Connie Kazanjian pursuant to her separate written agreement with Client.** Counsel shall provide Client and Connie Kazanjian a closing statement in connection with any disbursement of payments. **In the event of any fee dispute, all such monies shall remain in escrow**, and if the fee dispute cannot be resolved by mutual agreement it shall be resolved by arbitration."

Therefore, it would be a clear violation of the rules of ethics to suggest that you are unaware of my client's contractual rights.

We therefore demand that you promptly notify Exafer, as well as its principals, of our client's contractual right to receive 30% of any net recovery obtained from the litigation against Microsoft. Furthermore, we emphasize the obligation and responsibility of your law firm, as explicitly acknowledged in the consulting agreement, to safeguard and withhold funds in trust that rightfully belong to our Client. To that end, kindly acknowledge receipt of this letter within 5 business days and provide a written response outlining your client's position and your firm's course of action to ensure that our Client's rights are protected, and acknowledge your fiduciary obligations with regard to any disputed monies placed in your firm's trust account.

Failure to comply with this demand will be construed as a deliberate disregard of your professional and ethical obligations, as well as a violation of our Client's contractual rights, and appropriate legal action will be commenced forthwith.

I AWAIT YOUR RESPONSE.

Sincerely,

**HOFFMAN, LARIN & AGNETTI, P.A.**

John B. Agnetti, Esq.
For the Firm

HOFFMAN, LARIN AND AGNETTI, P.A.

# Broker Agreement

This Agreement is made between the Parties for the purposes of facilitating intellectual property transactions.

This IP Broker Agreement ("**Agreement**") is entered into effective as of May 16th 2018 (the "**Effective Date**") between:

Kazanjian Consulting LLC, a Florida limited company with offices at 12555 Biscayne Boulevard, Miami, FL 33138 ("Kazanjian"); and

Exafer Ltd, a limited company registered in Israel VAT# 514272525, with an address POB 345 Ein Vered, Israel 40696 ("**Client**").

The parties hereby agree therefore that this Agreement shall be effective as of the Effective Date and shall (subject to termination hereunder) continue in full force until December 31st 2018.

NOW THEREFORE it is hereby agreed as follows:

1.    DEFINITIONS

1.1    **"Affiliate"** means, in relation to any entity, any company or other entity which directly or indirectly controls, is controlled by or is under common control with that entity, where "control" means the ownership of more than 50% of the issued share capital or other equity interest or the legal power to direct or cause the direction of the general management and policies of such entity;

1.2    "**Patents**" means:
(a) the provisional patent applications, patent applications, and patents listed on Exhibits A ("Listed Patents"), including patents or patent applications:
    (i) to which any of the Listed Patents directly or indirectly claims priority,
    (ii) for which any of the Listed Patents directly or indirectly forms a basis for priority or which otherwise share common priority with any of the Listed Patents, and/or
    (iii) that were co-owned applications that incorporate by reference, or are incorporated by reference into, the Listed Patents;

(b) reissues, re-examinations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing category (a);

(c) foreign patents, patent applications and counterparts relating to any item in any of the foregoing categories (a) to (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances; and

(d) any items in any of the foregoing categories (a) to (c) whether or not expressly listed in Listed Patents and whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like.

1

1.3    **"Transaction"** means a legally binding agreement between the Client (or, as applicable, Owner) and a Qualified Purchaser for a license, assignment or any other transfer of or access to rights in or relating to the Patents or any of them (including, if applicable, the sale of the relevant part of the Client's (or, as applicable, Owner's) business).

## 2. APPOINTMENT

2.1    Whereas, Client owns or represents the legal owner ("Owner") of the Patents and Client (or, as applicable, Owner) wishes to assign or license said Patents for valuable consideration;

2.2    Whereas, Kazanjian is in the business of representing patent owners in the marketing and promotion of patents and related intellectual property rights available for assignment or license;

2.3    Client hereby appoints Kazanjian, and Kazanjian hereby accepts such appointment throughout the Term of this Agreement, as Client's exclusive worldwide representative to facilitate and promote the sale, assignment and/or licensing of the Patents to any person, company, firm or other entity that may wish to purchase a license, assignment or other transfer of or access to all or any of the Patents (a "Potential Purchaser").

## 3   APPROACHES

3.1    Kazanjian may approach one or more Potential Purchasers at its sole discretion based on Kazanjian's market intelligence.

3.2    If and when Kazanjian provides to Client a Potential Purchaser who has expressed a definite interest in purchasing a license, assignment or other transfer of or access to all or any of the Patents (a "Qualified Purchaser"), Client will not directly approach such Qualified Purchaser in connection therewith unless Client can provide dated and documented evidence of a substantial prior relationship with such Qualified Purchaser relating specifically to the sale/purchase of a license, assignment or other transfer of or access to all or any of the Patents.  After the completion of the 6-month term, Kazanjian shall provide a list of all Qualified Purchasers where explicit documented interest in in the assets has been given.  This list will define the Qualified Purchasers for the purposes of the Post Term arrangements.

3.3    Kazanjian will have no authority under this Agreement to bind Client in any way to any party or to make any representation, contract or commitment on behalf of Client.  In addition, nothing contained in this Agreement will require Client to accept the terms of any proposed sale.

## 4. COMMISSION

4.1    Client agrees to pay Kazanjian a (the "Commission") as thirty per cent (i.e. 30%) of any net monies, including the amount of any payment and the value of any non-monetary receipt obtained by or due to Client (or any Affiliate of the Client) from a Transaction including, but not limited to:

(a)   up-front, milestone, success, bonus, maintenance and periodic payments, royalty payments and any other payments or benefits for the term of Patents;

(b) shares, options or other securities in respect of the share capital of any Potential Purchaser or any Affiliate of a potential purchaser, or any other company or entity;

(c) any investment in the shares or other securities or in the business of the Client or any Affiliate of the Client;

(d) the value and/or benefit of any debt assumption or debt forgiveness or cease of legal action (including but not limited to a patent infringement lawsuit); and

(e) the value of any OEM agreements, distribution agreements, licenses (including cross licenses), or assets (including but not limited to other tangible and non-tangible assets as well as intellectual property assets);

(collectively the "Total Transaction Value").

4.2    This provision relating to the Commission will survive termination or expiry of this Agreement for any reason and will continue for the purposes of the clause 7.


5.    PAYMENT TERMS

5.1    Upon receipt by the Client of any payment or benefit comprising all or part of the Total Transaction Value, the Client will provide Kazanjian with a statement setting out the amount received and, in the case of any non-monetary receipts, stating the net monetary value attributed to that receipt and the basis on which this has been calculated.  In the event the Client enters into a contract with a third party, introduced by Kazanjian, for services to enforce its Patents, then Client agrees to have the net Commission due to Kazanjian paid directly by such third party collecting the licensing revenues.

5.2    Following receipt of any such statement, Kazanjian will issue an invoice for the Commission due to it. Notwithstanding the terms of the preceding two sentences, where Kazanjian receives notification from any third party or otherwise becomes aware that the Client has received any payment or benefit comprising all or part of the Total Transaction Value,

5.3    Kazanjian shall be free to issue its invoice immediately in respect of the Commission due to it thereon, regardless of whether or not the Client provides a statement, as described above.

5.4    All payments due from the Client to Kazanjian under this Agreement (i) will be paid immediately by return on receipt of Kazanjian's invoice; (ii) are exclusive of any value added or other sales, use, excise or similar taxes which may be due, all of which will be paid in addition by the Client at the applicable rate; and (iii) will be paid without deduction of income tax or other taxes, charges or duties that may be imposed, except in so far as the Client is required to make those deductions to comply with applicable laws.

3

5.5    The Client will keep separate accounts and records in sufficient detail to support the statements provided pursuant to this Agreement, and will permit Kazanjian or its duly appointed representatives during business hours and on reasonable notice (but no more than once in any period of 12 consecutive months) to inspect all such accounts and records and to take copies thereof.  Kazanjian will bear the cost of any such inspection, unless that inspection reveals that the Client has underpaid Kazanjian by more than five per cent (5%), in which case the Client will immediately reimburse the cost of the inspection and  pay any shortfall (plus reasonable interest thereon).

5.6    The proceeding provisions relating to the "Payment Terms" will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

6.    COOPERATION

6.1    The Client will promptly provide all reasonable assistance, information, support and co-operation as Kazanjian may require from time to time, including without limitation, true and accurate information on the patents identified in Exhibit A.

7.    POST TERM

7.1    If a Transaction with a Kazanjian introduced party  should be completed within 12 months after the expiry of the Term or earlier termination of this Agreement then Kazanjian will remain entitled to one hundred per cent (100%) of the Commission.

7.2 This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

8    ANTI CIRCUMVENTION

8.1    The Client (including any of its employees, agents, affiliates, and/or representatives) shall not: (i) circumvent Kazanjian in an effort to eliminate Kazanjian as the sole contact with any Qualified Purchaser, or attempt directly or indirectly to contact or conduct business or negotiate with any Qualified Purchaser relating to the Patents throughout the Term; or (ii) do or omit to do anything or enter into any side or other agreement in relation to, or including, the Patents in respect of which the intention or result is to reduce the Commission that would otherwise be payable to Kazanjian under this Agreement.  Any breach of this paragraph shall place the Client in material breach of this Agreement and liable for damages in favor of Kazanjian.

8.2    This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

4

9.    TERMINATION

9.1    Either party will have the right to terminate this Agreement if (i) the other party commits any material breach or series of minor breaches of any of its obligations under this Agreement which (if capable of remedy) it fails to remedy within fifteen (15) days following receipt of written notice from the other party, or (ii) the other party becomes bankrupt or insolvent, or if an order is made or a resolution is passed for its winding up (other than voluntarily for the purpose of solvent amalgamation or reconstruction), or if an administrator, administrative receiver or receiver is appointed in respect of the whole or any part of its assets or business, or if it makes any composition with its creditors or takes or suffers any similar or analogous action in any jurisdiction in consequence of debt.

10    NOTICES

10.1    Any notice under this Agreement shall be in writing in the English language and may be served by sending the notice by post or e-mail transmission addressed to the party to be served at the address given above or at such other address as that party shall from time to time by notice in writing give to the other party for the purpose of service of notices here-under.

11    LIABILITY

11.1    Nothing in this Agreement will operate to limit or exclude the liability of either party for death or personal injury resulting from its negligence or for liability for fraud.

11.2    Subject to the preceding sentence, Kazanjian's total liability to the Client in connection with the performance or non-performance of this Agreement, whether in contract, or tort (including negligence) or arising in any other way, shall not exceed $5,000

11.3    This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

12    MISCELLANEOUS

12.1    If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

12.2    No change, modification, extension, or termination of this Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by the parties.

12.3    This Agreement represents the entire agreement between the parties regarding the subject matter hereof and shall supersede all previous communications, representations, understandings and agreements, whether oral or written, by or between the parties with respect to the subject matter hereof.

12.4    Neither Party may assign or transfer (in whole or in part) this Agreement without the prior written consent of the other Party, except that either Party may assign this Agreement to an affiliated company or any third party to whom its business is transferred.


13      JURISDICTION

13.1    This Agreement shall be governed by, and interpreted in accordance with the laws of Florida, without regard to the principles of conflict of laws thereof.

13.2    Any legal or equitable action arising out of or relating to this Agreement shall be instituted and maintained exclusively in the courts of England and Wales except that either party may apply for an interim or emergency injunction in any court of competent jurisdiction.


**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) shown below.

**Kazanjian Consulting LLC**                      **Exafer Ltd**


_____                          _____
Signature                                        Signature

**Connie Kazanjian**                             **Amir Harel**


**President**                                    **Co-owner**

_____5. 24.18_____                           _____5.23.18_____
Date                                             Date

6

**Exhibit A**

| Patent Number | Title | Assignee/Inventor Name |
|---|---|---|
| US8971335 | System and method for creating a transitive optimized flow path | Exafer Ltd |
| US8325733 | Method and system for layer 2 manipulator and forwarder | Exafer Ltd |

7



GOLDBERG SEGALLA<sup>LLP</sup>

Chandran B. Iyer | Partner
Direct 646.292.8778 | ciyer@goldbergsegalla.com

April 4, 2019

**Via Electronic Mail**
Mr. Amir Harel
Mr. Alon Lelcuk
Exafer Ltd.
POB 345
Ein Vered, Israel 40696

Re:     Retainer Agreement for enforcement and associated negotiations for
the Exafer Patent Portfolio

Dear Messrs. Harel and Lelcuk:

Thank you for retaining Goldberg Segalla LLP (hereinafter "Firm" or "GS") to act
as the legal representative for Exafer Ltd. (hereinafter "Client" or You) in the
enforcement of your rights (the "Matter(s)") in the patents listed on Schedule A,
together with all continuations, continuations-in-part, divisionals, reexaminations and
reissues thereof (hereinafter "Patents"). The Client is the exclusive owner of the
Patents. As we have discussed, the enforcement efforts will commence with the filing of
a lawsuit against Microsoft in an appropriate venue, and associated negotiations. The
terms set forth in this agreement shall apply to the lawsuit against Microsoft and any
future enforcement efforts where a litigation funder is required to finance both the
litigation fees and costs. If, on the other hand, You choose to finance all of the litigation
costs in an enforcement campaign, the terms set forth in the October 2, 2018 agreement
between You and the Firm shall apply.

In compliance with the requirements of the New York Bar and our firm's
policies, we are providing the Client with this engagement letter setting forth GS's
billing policies and our responsibilities and duties as your attorneys. Our reputation
and the trust our clients have in us are our stock in trade, so it is important that we have
a clear understanding on both fees and conflicts.

The Firm agrees to consult with Client and acknowledges that Client are
authorized and shall be making the final decision on all major issues, such as settlement
negotiations, and other substantive issues subject to the terms of this Agreement. We

711 3rd Avenue, Suite 1900 | New York, NY 10017 | 646.292.8700 | Fax 646.292.8701 | **www.GoldbergSegalla.com**

NEW YORK | ILLINOIS | FLORIDA | CALIFORNIA | MARYLAND | MISSOURI | NORTH CAROLINA | PENNSYLVANIA | NEW JERSEY | CONNECTICUT | UNITED KINGDOM

Error! Unknown document property name.

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 2

will keep Client abreast of important developments throughout the litigation and will
promptly report any communications from the defendant(s) concerning settlement.

## SCOPE OF LEGAL SERVICES

The Firm shall investigate, handle and prosecute any and all claims, statutory or
otherwise, which you may have for damages with respect to the Patents, including the
defense of any claim(s) or counterclaim(s) brought against you in relation to, or as a
result of, our efforts to enforce the Patents, according to the terms, conditions, and
limitations set forth in this Agreement. For the duration of this Agreement, any
compensation received in connection with the Patents from any third party will be
subject to the terms of this Agreement, unless excluded pursuant to a provision set forth
herein.

You agree that GS is the sole and exclusive legal representative in connection
with your efforts to license or otherwise monetize the Patents. No other law firm will be
retained to bring an action for patent infringement under any of the Patents during the
time we are representing you.

## COMPENSATION FOR LITIGATION

Our charges are typically based on the amount of time our attorneys spend on a
particular case. Hourly rates for members of GS currently range from $145 per hour for
paralegal time to $810 for the most senior attorneys' time. Those likely to be working
on matters for you have hourly rates ranging from $150 per hour for paralegal time,
$260-$515 per hour for associate time, and $420-$810 per hour for senior attorney (i.e.,
partner) time, as of the date of this letter. These rates are reviewed annually.

Notwithstanding the foregoing, Client and the Firm have agreed that the Firm
will handle the Matter on a contingency fee arrangement as described below, and the
Firm will not be charging you based on its hourly rates.

During litigation, it is necessary to incur out-of-pocket expenses. Examples of
these expenses include court costs such as filing fees, photocopying costs, travel and
lodging costs, local counsel attorney fees, expert and consultant fees, delivery services,
translation services (if applicable), electronic research, and so forth. Out-of-pocket
expenses shall also include any costs incurred from a post-grant proceeding such as
*Inter Partes* Review or an *Ex Parte* Reexamination. The Firm shall be responsible for all
such out-of-pocket expenses.

In exchange for the firm handling this monetization campaign on a contingency
basis, the Firm shall receive 48% of the Net Recovery (defined herein as total recovery

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 3

minus any out-of-pocket expenses paid by the Firm) and You shall receive the remaining 52% of the Net Recovery.

If the Firm, in its sole discretion, declines to file suit or otherwise represent you against a New Defendant due to conflicts or other issues, you will be free to engage other counsel or representation to handle that suit, discussion, and/or negotiations, and will have no obligation to make a contingent or other payment to the Firm with respect to such New Defendant. Unless agreed otherwise, however, such suit, discussion and/or negotiations cannot be engaged in during the pendency of any case that we are litigating on your behalf.

The Firm agrees not to commence any lawsuit without your prior written approval.

Prior to litigation, it may be necessary for any litigation funder interested in funding this monetization campaign to conduct due diligence on the merits of any proposed case including, but not limited to, theories of liability and damages. The litigation funder is free to commence due diligence immediately after the execution of the instant agreement. If You, in your sole discretion, decline to file suit once the due diligence has commenced, you agree to reimburse the full cost of due diligence expended by the litigation funder.

## OTHER COMPENSATION PROVISIONS

As the enforcement/monetization campaign progresses, facts and positions will be more fully developed by all parties. The Firm will continue to assess these facts and positions and retains its right to withdraw from representing you against one or more targets at the Firm's discretion. If the Firm elects to cease its representation with respect to a third party, the Firm shall not be entitled to any compensation, contingent or otherwise with respect to that third party.

## TERMINATION

You may terminate the Firm's representation with respect to any one or more targets that are involved in litigation at any time. In such event, you shall pay the Firm out of the compensation received from that target, based on the work performed by the Firm (measured in hours worked), relative to the work performed by such other firm(s) that you engage. For example, if the work performed by GS is 25% of the total amount of work performed by all firms representing you with respect to a third party, then the Firm would receive 25% of the law firm's total share of the Net Recovery from that target.

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 4

## SETTLEMENT, JUDGMENT OR OTHER COMPENSATION

Counsel shall be the recipient of all payments made under any License Agreement, Judgment or Settlement, which shall promptly be deposited in Counsel's trust account. After deductions first for Compensation and second for Expenses due Counsel, which Counsel shall be entitled to keep, Counsel shall then disburse the remainder to Client and to Connie Kazanjian within 15 days of receipt thereof by Counsel, and in the case of Connie Kazanjian pursuant to her separate written agreement with Client. Counsel shall provide Client and Connie Kazanjian a closing statement in connection with any disbursement of payments. In the event of any fee dispute, all such monies shall remain in escrow, and if the fee dispute cannot be resolved by mutual agreement it shall be resolved by arbitration.

## MISCELLANEOUS

You confirm that, to the best of your knowledge, you are the sole owner of the entire right, title and interest in and to the Patents and that you have not conveyed to any others any rights whatsoever in the Patents, including, without limitation to, the rights to sue upon the patent. Further, you agree that during the course of the Firm's representation of you in this matter, you will not sell, transfer or otherwise convey any of the rights, title and/or interest in the Patents other than as provided pursuant to the terms of this Agreement, or as part of your normal business activities and service provision.

As lawyers, we are governed by the Code of Professional Responsibility. We make every effort to avoid disputes regarding the reasonableness of our billing arrangements and fees. Should a dispute arise, however, we agree to have the dispute submitted for resolution by binding arbitration, subject to your right to have reasonable discovery of the facts and the evidence deemed necessary by you or your counsel. We believe that arbitration provides a client with an inexpensive method of resolving such disputes.

This agreement constitutes the only agreement of the parties and supersedes any prior understandings, written or oral between the parties. Any modification of this agreement will be of no effect unless in writing and signed by the parties.

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 5

   To acknowledge your understanding of the foregoing and as your acceptance of the terms set forth above, please sign the enclosed copy of this engagement letter and contingency representation Agreement and return the signed copy to us.

Very truly yours,

GOLDBERG SEGALLA LLP

Chandran B. Iyer

ACKNOWLEDGED AND AGREED TO

this _____ day of _____, 2019.

By: _____

Name: _____

Title: _____

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 6

## SCHEDULE A

| Patent No. | Title |
|---|---|
| 8,325,733 | Method and system for layer 2 manipulator and forwarder |
| 8,971,335 | System and method for creating a transitive optimized flow path |



## HOFFMAN, LARIN & AGNETTI, P.A.
### ATTORNEYS AT LAW

JOHN B. AGNETTI

MARTIN L. HOFFMAN
ALSO MEMBER NEW YORK BAR

DAVID L. PERKINS
ALSO MEMBER NEW YORK BAR

MICHAEL S. HOFFMAN
_____
OF COUNSEL

HAROLD M. HOFFMAN
MEMBER NEW YORK AND
NEW JERSEY BAR ONLY

(305) 653-5555
(800) 803-5555
FAX (305) 940-0090

INFO@HLALAW.COM
WWW.HLALAW.COM

909 N. MIAMI BEACH BLVD.
SUITE 201
MIAMI, FL 33162-3712

6750 NORTH ANDREWS AVE.
SUITE 200
FORT LAUDERDALE, FL 33309

82681 OVERSEAS HIGHWAY
ISLAMORADA, FL 33036

422 FLEMING STREET
KEY WEST, FL 33040

**VIA U.S. CERTIFIED MAIL**
**VIA EMAIL** cbiyer@daignaultiyer.com

July 18, 2023

Mr. Chandran Iyer
Partner
Daignault Iyer LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182

**Re:    URGENT: Client's Contractual Rights & Demand for Immediate Action**
**Kazanjian Consulting LLC and Exafer Ltd Broker Agreement dd. March 16, 2018**
**U.S. Patent Nos.: US 8,971,335 and US 8,325,733**

Dear Mr. Iyer:

Please be advised that our firm has been retained to represent the interests of Connie Kazanjian and Kazanjian Consulting LLC (collectively referred to herein as "Client") in connection with the attached Broker Agreement between our Client, Exafer Ltd ("Exafer") and Exafer's principal, Mr. Amir Hare, with regards to the monetization of certain patents that are currently the subject of ongoing litigation with Microsoft[1]. You were engaged to represent Exafer in this transaction.

According to the terms of the Broker Agreement, Exafer and Mr. Hare, expressly and unequivocally committed to paying our Client a commission of 30% of the net recovery resulting from our Client's efforts in monetizing said patents. However, now that there is a distinct possibility of a multimillion-dollar recovery, Exafer, through Mr. Hare, has indicated its unwillingness to fulfill its obligation to remit the agreed-upon commission. This sudden change in position by Exafer constitutes a clear violation of their contractual obligations and amounts to anticipatory repudiation of the Broker Agreement.

_____
[1] Exafer Ltd v. Microsoft Corporation (1:20-cv-00131), District Court, W.D. Texas



EXHIBIT
"D"

The enclosed Retainer Agreement, executed on April 4, 2019, between yourself, Mr. Amir Hare, Mr. Alon Lelcuk, and Exafer, expressly stipulates the following:

> "*Counsel shall be the recipient of all payment made under any License Agreement, Judgment or Settlement, which shall promptly be deposited in Counsel's trust account. After deductions first for Compensation and second for Expenses Due Counsel, which Counsel shall be entitled to keep, **Counsel shall then disburse the remainder to Client and to Connie Kazanjian within 15 days of receipt thereof by Counsel, and in the case of Connie Kazanjian pursuant to her separate written agreement with Client.** Counsel shall provide Client and Connie Kazanjian a closing statement in connection with any disbursement of payments. **In the event of any fee dispute, all such monies shall remain in escrow,** and if the fee dispute cannot be resolved by mutual agreement it shall be resolved by arbitration.*"

We therefore demand that you promptly notify Exafer, as well as its principals, of our client's contractual right to receive 30% of any net recovery obtained from the litigation against Microsoft. Furthermore, we emphasize your obligation and responsibility, as explicitly acknowledged in your Retainer Agreement, to safeguard and withhold funds in trust that rightfully belong to our Client in the event of a fee dispute. To that end, kindly acknowledge receipt of this letter within 5 business days and provide a written response outlining your client's position and your firm's course of action to ensure that our Client's rights are protected.

Failure to comply with this demand will be construed as a deliberate disregard of your professional and ethical obligations, as well as a violation of our Client's contractual rights, and appropriate legal action will be commenced forthwith.

I AWAIT YOUR RESPONSE.

Sincerely,

**HOFFMAN, LARIN & AGNETTI, P.A.**

John B. Agnetti, Esq.
For the Firm

# Broker Agreement

This Agreement is made between the Parties for the purposes of facilitating intellectual property transactions.

This IP Broker Agreement (**"Agreement"**) is entered into effective as of May 16th 2018 (the **"Effective Date"**) between:

Kazanjian Consulting LLC, a Florida limited company with offices at 12555 Biscayne Boulevard, Miami, FL 33138 (**"Kazanjian"**); and

Exafer Ltd, a limited company registered in Israel VAT# 514272525, with an address POB 345 Ein Vered, Israel 40696 (**"Client"**).

The parties hereby agree therefore that this Agreement shall be effective as of the Effective Date and shall (subject to termination hereunder) continue in full force until December 31st 2018.

NOW THEREFORE it is hereby agreed as follows:

1.      DEFINITIONS

1.1     **"Affiliate"** means, in relation to any entity, any company or other entity which directly or indirectly controls, is controlled by or is under common control with that entity, where "control" means the ownership of more than 50% of the issued share capital or other equity interest or the legal power to direct or cause the direction of the general management and policies of such entity;

1.2     **"Patents"** means:
(a) the provisional patent applications, patent applications, and patents listed on Exhibits A ("Listed Patents"), including patents or patent applications:
(i) to which any of the Listed Patents directly or indirectly claims priority,
(ii) for which any of the Listed Patents directly or indirectly forms a basis for priority or which otherwise share common priority with any of the Listed Patents, and/or
(iii) that were co-owned applications that incorporate by reference, or are incorporated by reference into, the Listed Patents;

(b) reissues, re-examinations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, and registrations of any item in any of the foregoing category (a);

(c) foreign patents, patent applications and counterparts relating to any item in any of the foregoing categories (a) to (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances; and

(d) any items in any of the foregoing categories (a) to (c) whether or not expressly listed in Listed Patents and whether or not claims in any of the foregoing have been rejected, withdrawn, cancelled, or the like.

1

1.3 **"Transaction"** means a legally binding agreement between the Client (or, as applicable, Owner) and a Qualified Purchaser for a license, assignment or any other transfer of or access to rights in or relating to the Patents or any of them (including, if applicable, the sale of the relevant part of the Client's (or, as applicable, Owner's) business).

## 2. APPOINTMENT

2.1    Whereas, Client owns or represents the legal owner ("Owner") of the Patents and Client (or, as applicable, Owner) wishes to assign or license said Patents for valuable consideration;

2.2    Whereas, Kazanjian is in the business of representing patent owners in the marketing and promotion of patents and related intellectual property rights available for assignment or license;

2.3    Client hereby appoints Kazanjian, and Kazanjian hereby accepts such appointment throughout the Term of this Agreement, as Client's exclusive worldwide representative to facilitate and promote the sale, assignment and/or licensing of the Patents to any person, company, firm or other entity that may wish to purchase a license, assignment or other transfer of or access to all or any of the Patents (a "Potential Purchaser").

## 3   APPROACHES

3.1    Kazanjian may approach one or more Potential Purchasers at its sole discretion based on Kazanjian's market intelligence.

3.2    If and when Kazanjian provides to Client a Potential Purchaser who has expressed a definite interest in purchasing a license, assignment or other transfer of or access to all or any of the Patents (a "Qualified Purchaser"), Client will not directly approach such Qualified Purchaser in connection therewith unless Client can provide dated and documented evidence of a substantial prior relationship with such Qualified Purchaser relating specifically to the sale/purchase of a license, assignment or other transfer of or access to all or any of the Patents.  After the completion of the 6-month term, Kazanjian shall provide a list of all Qualified Purchasers where explicit documented interest in the assets has been given.  This list will define the Qualified Purchasers for the purposes of the Post Term arrangements.

3.3    Kazanjian will have no authority under this Agreement to bind Client in any way to any party or to make any representation, contract or commitment on behalf of Client.  In addition, nothing contained in this Agreement will require Client to accept the terms of any proposed sale.

## 4. COMMISSION

4.1    Client agrees to pay Kazanjian a (the "Commission") as thirty per cent (i.e. 30%) of any net monies, including the amount of any payment and the value of any non-monetary receipt obtained by or due to Client (or any Affiliate of the Client) from a Transaction including, but not limited to:

2

(a)   up-front, milestone, success, bonus, maintenance and periodic payments, royalty payments and any other payments or benefits for the term of Patents;

(b) shares, options or other securities in respect of the share capital of any Potential Purchaser or any Affiliate of a potential purchaser, or any other company or entity;

(c) any investment in the shares or other securities or in the business of the Client or any Affiliate of the Client;

(d) the value and/or benefit of any debt assumption or debt forgiveness or cease of legal action (including but not limited to a patent infringement lawsuit); and

(e) the value of any OEM agreements, distribution agreements, licenses (including cross licenses), or assets (including but not limited to other tangible and non-tangible assets as well as intellectual property assets);

(collectively the "Total Transaction Value").

4.2      This provision relating to the Commission will survive termination or expiry of this Agreement for any reason and will continue for the purposes of the clause 7.


5.      PAYMENT TERMS

5.1      Upon receipt by the Client of any payment or benefit comprising all or part of the Total Transaction Value, the Client will provide Kazanjian with a statement setting out the amount received and, in the case of any non-monetary receipts, stating the net monetary value attributed to that receipt and the basis on which this has been calculated. In the event the Client enters into a contract with a third party, introduced by Kazanjian, for services to enforce its Patents, then Client agrees to have the net Commission due to Kazanjian paid directly by such third party collecting the licensing revenues.

5.2      Following receipt of any such statement, Kazanjian will issue an invoice for the Commission due to it. Notwithstanding the terms of the preceding two sentences, where Kazanjian receives notification from any third party or otherwise becomes aware that the Client has received any payment or benefit comprising all or part of the Total Transaction Value,

5.3      Kazanjian shall be free to issue its invoice immediately in respect of the Commission due to it thereon, regardless of whether or not the Client provides a statement, as described above.

5.4      All payments due from the Client to Kazanjian under this Agreement (i) will be paid immediately by return on receipt of Kazanjian's invoice; (ii) are exclusive of any value added or other sales, use, excise or similar taxes which may be due, all of which will be paid in addition by the Client at the applicable rate; and (iii) will be paid without deduction of income tax or other taxes, charges or duties that may be imposed, except in so far as the Client is required to make those deductions to comply with applicable laws.

5.5    The Client will keep separate accounts and records in sufficient detail to support the statements provided pursuant to this Agreement, and will permit Kazanjian or its duly appointed representatives during business hours and on reasonable notice (but no more than once in any period of 12 consecutive months) to inspect all such accounts and records and to take copies thereof. Kazanjian will bear the cost of any such inspection, unless that inspection reveals that the Client has underpaid Kazanjian by more than five per cent (5%), in which case the Client will immediately reimburse the cost of the inspection and  pay any shortfall (plus reasonable interest thereon).

5.6    The proceeding provisions relating to the "Payment Terms" will survive termination or expiry of this Agreement for any reason and will continue indefinitely.


6.    COOPERATION

6.1    The Client will promptly provide all reasonable assistance, information, support and co-operation as Kazanjian may require from time to time, including without limitation, true and accurate information on the patents identified in Exhibit A.


7.    POST TERM

7.1    If a Transaction with a Kazanjian introduced party  should be completed within 12 months after the expiry of the Term or earlier termination of this Agreement then Kazanjian will remain entitled to one hundred per cent (100%) of the Commission.


7.2 This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.


8    ANTI CIRCUMVENTION

8.1    The Client (including any of its employees, agents, affiliates, and/or representatives) shall not: (i) circumvent Kazanjian in an effort to eliminate Kazanjian as the sole contact with any Qualified Purchaser, or attempt directly or indirectly to contact or conduct business or negotiate with any Qualified Purchaser relating to the Patents throughout the Term; or (ii) do or omit to do anything or enter into any side or other agreement in relation to, or including, the Patents in respect of which the intention or result is to reduce the Commission that would otherwise be payable to Kazanjian under this Agreement.  Any breach of this paragraph shall place the Client in material breach of this Agreement and liable for damages in favor of Kazanjian.

8.2    This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

4

9.    TERMINATION

9.1    Either party will have the right to terminate this Agreement if (i) the other party commits any material breach or series of minor breaches of any of its obligations under this Agreement which (if capable of remedy) it fails to remedy within fifteen (15) days following receipt of written notice from the other party, or (ii) the other party becomes bankrupt or insolvent, or if an order is made or a resolution is passed for its winding up (other than voluntarily for the purpose of solvent amalgamation or reconstruction), or if an administrator, administrative receiver or receiver is appointed in respect of the whole or any part of its assets or business, or if it makes any composition with its creditors or takes or suffers any similar or analogous action in any jurisdiction in consequence of debt.

10    NOTICES

10.1    Any notice under this Agreement shall be in writing in the English language and may be served by sending the notice by post or e-mail transmission addressed to the party to be served at the address given above or at such other address as that party shall from time to time by notice in writing give to the other party for the purpose of service of notices here-under.

11    LIABILITY

11.1    Nothing in this Agreement will operate to limit or exclude the liability of either party for death or personal injury resulting from its negligence or for liability for fraud.

11.2    Subject to the preceding sentence, Kazanjian's total liability to the Client in connection with the performance or non-performance of this Agreement, whether in contract, or tort (including negligence) or arising in any other way, shall not exceed $5,000

11.3    This clause will survive termination or expiry of this Agreement for any reason and will continue indefinitely.

12    MISCELLANEOUS

12.1    If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable, (i) that provision shall be deemed amended to achieve as nearly as possible the same effect as the original provision, and (ii) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

12.2    No change, modification, extension, or termination of this Agreement, or any of the provisions herein contained, shall be valid unless made in writing and signed by the parties.

12.3    This Agreement represents the entire agreement between the parties regarding the subject matter hereof and shall supersede all previous communications, representations, understandings and agreements, whether oral or written, by or between the parties with respect to the subject matter hereof.

5

12.4    Neither Party may assign or transfer (in whole or in part) this Agreement without the prior written consent of the other Party, except that either Party may assign this Agreement to an affiliated company or any third party to whom its business is transferred.


13      JURISDICTION

13.1    This Agreement shall be governed by, and interpreted in accordance with the laws of Florida, without regard to the principles of conflict of laws thereof.

13.2    Any legal or equitable action arising out of or relating to this Agreement shall be instituted and maintained exclusively in the courts of England and Wales except that either party may apply for an interim or emergency injunction in any court of competent jurisdiction.


**IN WITNESS WHEREOF** the parties have caused this Agreement to be executed by their duly authorized representatives on the date(s) shown below.

**Kazanjian Consulting LLC**                    **Exafer Ltd**

_____                         _____
Signature                                        Signature

**Connie Kazanjian**                             **Amir Harel**


**President**                                    **Co-owner**
        5. 24. 18                                        5.23.18
_____                         _____
Date                                             Date

6

**Exhibit A**

| Patent Number | Title | Assignee/inventor Name |
|---|---|---|
| US8971335 | System and method for creating a transitive optimized flow path | Exafer Ltd |
| US8325733 | Method and system for layer 2 manipulator and forwarder | Exafer Ltd |

7



GOLDBERG SEGALLA LLP

Chandran B. Iyer | Partner
Direct 646.292.8778 | ciyer@goldbergsegalla.com

April 4, 2019

**Via Electronic Mail**
Mr. Amir Harel
Mr. Alon Lelcuk
Exafer Ltd.
POB 345
Ein Vered, Israel 40696

Re:     **Retainer Agreement for enforcement and associated negotiations for
the Exafer Patent Portfolio**

Dear Messrs. Harel and Lelcuk:

Thank you for retaining Goldberg Segalla LLP (hereinafter "Firm" or "GS") to act
as the legal representative for Exafer Ltd. (hereinafter "Client" or You) in the
enforcement of your rights (the "Matter(s)") in the patents listed on Schedule A,
together with all continuations, continuations-in-part, divisionals, reexaminations and
reissues thereof (hereinafter "Patents"). The Client is the exclusive owner of the
Patents. As we have discussed, the enforcement efforts will commence with the filing of
a lawsuit against Microsoft in an appropriate venue, and associated negotiations. The
terms set forth in this agreement shall apply to the lawsuit against Microsoft and any
future enforcement efforts where a litigation funder is required to finance both the
litigation fees and costs. If, on the other hand, You choose to finance all of the litigation
costs in an enforcement campaign, the terms set forth in the October 2, 2018 agreement
between You and the Firm shall apply.

In compliance with the requirements of the New York Bar and our firm's
policies, we are providing the Client with this engagement letter setting forth GS's
billing policies and our responsibilities and duties as your attorneys. Our reputation
and the trust our clients have in us are our stock in trade, so it is important that we have
a clear understanding on both fees and conflicts.

The Firm agrees to consult with Client and acknowledges that Client are
authorized and shall be making the final decision on all major issues, such as settlement
negotiations, and other substantive issues subject to the terms of this Agreement. We

711 3rd Avenue, Suite 1900 | New York, NY 10017 | 646.292.8700 | Fax 646.292.8701 | **www.GoldbergSegalla.com**

NEW YORK | ILLINOIS | FLORIDA | CALIFORNIA | MARYLAND | MISSOURI | NORTH CAROLINA | PENNSYLVANIA | NEW JERSEY | CONNECTICUT | UNITED KINGDOM

**Error! Unknown document property name.**

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 2

will keep Client abreast of important developments throughout the litigation and will promptly report any communications from the defendant(s) concerning settlement.

## SCOPE OF LEGAL SERVICES

The Firm shall investigate, handle and prosecute any and all claims, statutory or otherwise, which you may have for damages with respect to the Patents, including the defense of any claim(s) or counterclaim(s) brought against you in relation to, or as a result of, our efforts to enforce the Patents, according to the terms, conditions, and limitations set forth in this Agreement.  For the duration of this Agreement, any compensation received in connection with the Patents from any third party will be subject to the terms of this Agreement, unless excluded pursuant to a provision set forth herein.

You agree that GS is the sole and exclusive legal representative in connection with your efforts to license or otherwise monetize the Patents. No other law firm will be retained to bring an action for patent infringement under any of the Patents during the time we are representing you.

## COMPENSATION FOR LITIGATION

Our charges are typically based on the amount of time our attorneys spend on a particular case.  Hourly rates for members of GS currently range from $145 per hour for paralegal time to $810 for the most senior attorneys' time.  Those likely to be working on matters for you have hourly rates ranging from $150 per hour for paralegal time, $260-$515 per hour for associate time, and $420-$810 per hour for senior attorney (i.e., partner) time, as of the date of this letter. These rates are reviewed annually.

Notwithstanding the foregoing, Client and the Firm have agreed that the Firm will handle the Matter on a contingency fee arrangement as described below, and the Firm will not be charging you based on its hourly rates.

During litigation, it is necessary to incur out-of-pocket expenses.  Examples of these expenses include court costs such as filing fees, photocopying costs, travel and lodging costs, local counsel attorney fees, expert and consultant fees, delivery services, translation services (if applicable), electronic research, and so forth. Out-of-pocket expenses shall also include any costs incurred from a post-grant proceeding such as *Inter Partes* Review or an *Ex Parte* Reexamination. The Firm shall be responsible for all such out-of-pocket expenses.

In exchange for the firm handling this monetization campaign on a contingency basis, the Firm shall receive 48% of the Net Recovery (defined herein as total recovery

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 3

minus any out-of-pocket expenses paid by the Firm) and You shall receive the
remaining 52% of the Net Recovery.

If the Firm, in its sole discretion, declines to file suit or otherwise represent you
against a New Defendant due to conflicts or other issues, you will be free to engage
other counsel or representation to handle that suit, discussion, and/or negotiations, and
will have no obligation to make a contingent or other payment to the Firm with respect
to such New Defendant. Unless agreed otherwise, however, such suit, discussion
and/or negotiations cannot be engaged in during the pendency of any case that we are
litigating on your behalf.

The Firm agrees not to commence any lawsuit without your prior written
approval.

Prior to litigation, it may be necessary for any litigation funder interested in
funding this monetization campaign to conduct due diligence on the merits of any
proposed case including, but not limited to, theories of liability and damages. The
litigation funder is free to commence due diligence immediately after the execution of
the instant agreement. If You, in your sole discretion, decline to file suit once the due
diligence has commenced, you agree to reimburse the full cost of due diligence
expended by the litigation funder.

## OTHER COMPENSATION PROVISIONS

As the enforcement/monetization campaign progresses, facts and positions will
be more fully developed by all parties.  The Firm will continue to assess these facts and
positions and retains its right to withdraw from representing you against one or more
targets at the Firm's discretion.  If the Firm elects to cease its representation with respect
to a third party, the Firm shall not be entitled to any compensation, contingent or
otherwise with respect to that third party.

## TERMINATION

You may terminate the Firm's representation with respect to any one or more
targets that are involved in litigation at any time.  In such event, you shall pay the Firm
out of the compensation received from that target, based on the work performed by the
Firm (measured in hours worked), relative to the work performed by such other firm(s)
that you engage.  For example, if the work performed by GS is 25% of the total amount
of work performed by all firms representing you with respect to a third party, then the
Firm would receive 25% of the law firm's total share of the Net Recovery from that
target.

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 4


## SETTLEMENT, JUDGMENT OR OTHER COMPENSATION

Counsel shall be the recipient of all payments made under any License Agreement, Judgment or Settlement, which shall promptly be deposited in Counsel's trust account. After deductions first for Compensation and second for Expenses due Counsel, which Counsel shall be entitled to keep, Counsel shall then disburse the remainder to Client and to Connie Kazanjian within 15 days of receipt thereof by Counsel, and in the case of Connie Kazanjian pursuant to her separate written agreement with Client. Counsel shall provide Client and Connie Kazanjian a closing statement in connection with any disbursement of payments. In the event of any fee dispute, all such monies shall remain in escrow, and if the fee dispute cannot be resolved by mutual agreement it shall be resolved by arbitration.

## MISCELLANEOUS

You confirm that, to the best of your knowledge, you are the sole owner of the entire right, title and interest in and to the Patents and that you have not conveyed to any others any rights whatsoever in the Patents, including, without limitation to, the rights to sue upon the patent. Further, you agree that during the course of the Firm's representation of you in this matter, you will not sell, transfer or otherwise convey any of the rights, title and/or interest in the Patents other than as provided pursuant to the terms of this Agreement, or as part of your normal business activities and service provision.

As lawyers, we are governed by the Code of Professional Responsibility. We make every effort to avoid disputes regarding the reasonableness of our billing arrangements and fees. Should a dispute arise, however, we agree to have the dispute submitted for resolution by binding arbitration, subject to your right to have reasonable discovery of the facts and the evidence deemed necessary by you or your counsel. We believe that arbitration provides a client with an inexpensive method of resolving such disputes.

This agreement constitutes the only agreement of the parties and supersedes any prior understandings, written or oral between the parties. Any modification of this agreement will be of no effect unless in writing and signed by the parties.

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 5

      To acknowledge your understanding of the foregoing and as your acceptance of the terms set forth above, please sign the enclosed copy of this engagement letter and contingency representation Agreement and return the signed copy to us.

Very truly yours,

GOLDBERG SEGALLA LLP

_____
Chandran B. Iyer


ACKNOWLEDGED AND AGREED TO

this _____ day of _____, 2019.

By: _____

Name:_____

Title: _____

Mr. Amir Harel
Mr. Alon Lelcuk
April 4, 2019
Page 6

## SCHEDULE A

| Patent No. | Title |
|------------|-------|
| 8,325,733 | Method and system for layer 2 manipulator and forwarder |
| 8,971,335 | System and method for creating a transitive optimized flow path |